**FOURTH DIVISION**
**DOYLE, P. J.,**
**MCFADDEN and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**June 27, 2013**

# In the Court of Appeals of Georgia

A13A0126. GARCIA-CARILLIO v. THE STATE.

BOGGS, Judge.

Manuel Garcia-Carillio appeals from his convictions of trafficking in cocaine, driving without a license, and following too closely. He contends that the trial court erred by denying his motion to suppress and by admitting into evidence three post-arrest telephone conversations recorded through a wiretap. He also asserts that his trafficking conviction must be reversed as a result of insufficient evidence of identity. For the reasons explained below, we affirm.

When reviewing the sufficiency of the evidence,

the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of

fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

(Citations and footnote omitted; emphasis in original.) *Jackson v. Virginia*, 443 U. S. 307, 319, (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

So viewed, the record shows that a known cocaine trafficker named Ada Cordero was the target of a police investigation that included a wiretap on Cordero's telephone. On June 23, 2009, police intercepted telephone calls between Cordero and "a Hispanic male that was going by the name of Manolo and Potrillo." A police sergeant with four years of experience in the narcotics unit and past work in hundreds of undercover operations testified that it is "extremely common" for a person in a drug trafficking organization to have multiple aliases.

On June 24, 2009, the police intercepted several telephone calls implicating Manolo/Potrillo in Cordero's drug trafficking organization. Based upon one of these phone calls, police believed that Manolo/Potrillo lived in number 904 of the Chatelaine Apartments and consequently began conducting surveillance outside

Apartment 904. The same day, police officers observed appellant come out of the breezeway from Apartment 904 and get into a white Nissan Sentra. They followed appellant as he drove to a restaurant associated with Cordero. While appellant was driving, police intercepted a telephone call between Cordero and Manolo/Potrillo in which Manolo/Potrillo stated he was "close by" and would "be there shortly." A few minutes later, the same officer that had observed the appellant enter the white Nissan outside Apartment 904 saw him pull into the restaurant parking lot with the same vehicle while talking on a cell phone, park, and enter the restaurant through the back entrance. In a second telephone conversation between Cordero and Manolo/Potrillo intercepted at the same time the police officer observed the appellant talking on the phone while pulling into the restaurant parking lot, Cordero reminded Manolo/Potrillo that she "said through the back" and he replied, "Yes, I will be back there in a minute."

The following day, police intercepted a call between Cordero and Manolo/Potrillo which indicated that Manolo/Potrillo would soon be involved in a drug transaction with another group. While conducting surveillance of Apartment 904, police observed appellant get out of his white Nissan and enter Apartment 904. At the same time, an SUV pulled into a parking space near the apartment, and two

3

additional people entered the apartment. Several hours later, appellant left the apartment carrying a black trash bag and a pizza delivery box and placed them in the back seat of the Nissan, where "[h]e started rumbling around with something else in there." The officer could not see what the appellant was doing in the back seat. After appellant got in the front seat of the car, another man came out of Apartment 904 and got into the passenger seat.

When appellant drove away, the police decided that

in order to try to figure out what was happening and who was involved in this two-day event that's going on . . . we were going to do what they call an ID stop or identification stop. A marked uniform officer was going to come up, follow behind the vehicle, wait for a traffic violation to occur and then conduct a traffic identification. Basically, we were going to identify who he was, find out what was happening at that time with the driver.

When an officer in a marked police truck caught up with the appellant on I-85 southbound at the request of the narcotics team, he "noticed it was following way too closely to a tractor-trailer." The officer testified that appellant was traveling 60 miles per hour about 10 feet behind the tractor-trailer "which is pretty much less than a car length." After witnessing appellant follow too closely for about a half mile, the officer activated the blue lights on his truck and stopped appellant. He explained that

4

when the narcotics team requests an "ID stop," he must develop his own probable cause for the stop.

When the officer informed appellant that he stopped him because he was following too closely and asked for his driver's license, appellant stated "he didn't have one, that he had a Mexican driver's license." The appellant then handed the police officer a Mexican driver's license and a Mexican consulate card, explaining that he had nothing else. When specifically asked, the appellant also informed the officer that he did not have a visa or a passport. He stated that he lived in the same apartment that had been under police surveillance.

When the officer checked the names of both men, he learned that the driver did not have a license in Georgia, and that the name provided for the passenger did have a valid driver's license. He then contacted an investigator with the surveillance team, provided this information, and asked for instruction. Based upon the request of the investigator, the patrol officer arrested the appellant for driving without a license and arranged for his transport to jail. During cross-examination in the motion to suppress hearing, the patrol officer testified that he "can't run a Mexican driver's license to determine if it's valid or not," that he believed the license was in Spanish, and that he did not recall the expiration date.

After arresting appellant, the patrol officer allowed the passenger to leave. He testified in the motion to suppress hearing that

> [t]he front passenger was not allowed to take the vehicle due to the fact that I can't prove who he is on the side of the road. There's not a picture that returns on his driver's license return. And it wouldn't be the first time that somebody has given out their brother or cousin's information, as well as it's an arrestable offense to drive without a license on their person.

The officer also testified that he impounded the vehicle because it was stuck in a turn lane and a hazard. During an inventory search following the impound of the vehicle, the officer discovered 987.20 grams of cocaine hidden in an empty toaster box on the backseat. The officer also discovered two "trap[s]" or hidden compartments that are used to transport drugs.

1. Appellant contends that the trial court erred in denying his motion to suppress because (a) the patrol officer lacked probable cause to stop him; (b) the stop was a pretext based upon the instruction of the investigator; and (c) his arrest for driving without a license was illegal.

> When we review a trial court's decision on such motions to exclude evidence, we construe the evidence most favorably to uphold the findings and judgment, and we adopt the trial court's findings on

6

disputed facts and credibility unless they are clearly erroneous. When the evidence is uncontroverted and no question of witness credibility is presented, the trial court's application of the law to undisputed facts is subject to de novo appellate review.

(Citations and punctuation omitted.) *Teele v. State*, 319 Ga. App. 448, 452 (2) (738 SE2d 277) (2012).

(a) We find no merit in appellant's contention that his motion to suppress should have been granted because the patrol officer lacked probable cause to stop him. First, probable cause to arrest is not necessary to stop a vehicle. Instead, all that is required is "specific and articulable facts that provide a reasonable suspicion that the individual being stopped is engaged in criminal activity." (Citations omitted.) *Jones v. State*, 291 Ga. 35, 38 (2) (727 SE2d 456) (2012). In this case, the patrol officer's testimony about the distance he observed between appellant's vehicle and the tractor-trailer provided a reasonable suspicion that appellant was following too closely in violation of OCGA § 40-6-49. See *Hall v. State*, 306 Ga. App. 484, 485 (1) (702 SE2d 483) (2010).

(b) We likewise find no merit in appellant's claim that his motion to suppress should have been granted because the stop of his vehicle "was pretextual." "A suppression motion arguing that a traffic stop was pretextual necessarily fails where

7

an officer observes the motorist committing even a minor traffic violation." (Citations and footnote omitted.) *Stearnes v. State*, 261 Ga. App. 522, 524 (2) (583 SE2d 195) (2003).

(c) Finally, we conclude that the motion to suppress should not have been granted on the ground that appellant's arrest for driving without a license was illegal. OCGA § 40-5-20 (a) provides:

> No person, except those expressly exempted in this chapter, shall drive any motor vehicle upon a highway in this state unless such person has a valid driver's license under this chapter for the type or class of vehicle being driven. Any person who is a resident of this state for 30 days shall obtain a Georgia driver's license before operating a motor vehicle in this state.

As the Supreme Court of Georgia recently explained,

> [t]he first sentence of OCGA § 40-5-20 (a) prohibits any person from driving in Georgia without having a valid driver's license for the vehicle being driven, unless he comes within one of the 13 exempt categories set forth in OCGA § 40-5-21. The second sentence of OCGA § 40-5-20 (a) then requires persons who become "residents" of Georgia, and thus presumably will be driving on this state's roads on a regular and ongoing basis, to obtain a *Georgia* driver's license after a 30-day grace period.

(Citations and footnotes omitted; emphasis in original.) *Castillo-Solis v. State*, 292 Ga. 755, 757 (2) (740 SE2d 583) (2013). No person is considered a resident of Georgia for purposes of the driver's license chapter of the Georgia Code "'unless such person is either a United States citizen or an alien with legal authorization.'" Id. at n. 5, citing OCGA § 40-5-1 (15). The only applicable exemption here is for

> any nonresident of Georgia who could receive a Georgia driver's license if he or she were a Georgia resident and who "has in his or her immediate possession a valid driver's license issued to him or her in his or her home state or country" and, if the foreign license is in a language other than English, "also has in his or her immediate possession a valid international driving permit."

Id. at n. 4, citing OCGA § 40-5-21 (a) (2). Because appellant admitted to the police officer that he had no visa or passport, and that the only documentation he could present was a Mexican driver's license written in Spanish and the Mexican consulate card, the police officer had probable cause to arrest him for driving without a license, and his arrest was lawful. See *Arroyo v. State*, 309 Ga. App. 494, 496 (2) (711 SE2d 60) (2011).

2. Appellant argues that the trial court erred by admitting into evidence, over his hearsay objection, three of Cordero's telephone conversations recorded the day

9

after his arrest because any conspiracy to commit a crime ended with his arrest. The record shows that the trial court admitted this evidence based upon its conclusion that the conspiracy was ongoing and for the purpose of showing identity – that appellant was the same person as Manolo/Potrillo.

Former OCGA § 24-3-5, in effect at the time this case was tried, provides: "After the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." "This statutory provision, a rule of evidence, does not include any condition precedent of indictment of a co-conspirator before the provision becomes applicable." *Porterfield v. State*, 137 Ga. App. 449 (1) (224 SE2d 94) (1976). And, "evidence of the declarations of the other conspirators made during the pendency of the conspiracy, including the wiretap conversations to which appellants had not been parties," can be admitted under this statute. (Citation omitted.) *Gilstrap v. State*, 162 Ga. App. 841, 846 (2) (292 SE2d 495) (1982). Finally,

> a conspiracy does not necessarily end simply because one or more of the conspirators have been arrested. So long as the conspiracy to conceal the fact that a crime has been committed or the identity of the perpetrators of the offense continues, the parties to such conspiracy are to be considered so much a unit that the declarations of either are admissible against the other.

(Citations and punctuation omitted.) *Cromwell v. State*, 218 Ga. App. 481, 483 (2) (462 SE2d 388) (1995).

In a telephone conversation recorded three days after appellant's arrest,[1] Cordero mentioned "possibly putting some money into Manolo's account in jail," and "that there were police everywhere" and she was warned "to be careful." The day after appellant's arrest,[2] Cordero asked someone by telephone to look up the charges and bond amount for a friend whom she identified using appellant's real name, Manuel Garcia-Carillo, and date of birth. Twenty minutes later, Cordero left a message stating she "just got out of jail," saw Potrillo, and that she was "checking to see if he has a bond, if he has something to get him out, because that that way cannot be, he (or it) can't work, man. Listen, I want you to be ready for Lento." A few minutes later, Cordero stated in a telephone conversation that Potrillo had been arrested for "no license, driving too closely and cocaine trafficking" and had no bond. She also stated, "That man would make my juice and all my things, a really good person, looking after me!"

---

[1] This conversation was admitted outside the presence of the jury to show the ongoing drug conspiracy.

[2] Recordings of three telephone conversations that took place the day after appellant's arrest were admitted into evidence.

11

We find no error in the admission of this evidence. One of appellant's defenses at trial was that he was *not* the same person identified as Manolo/Potrillo in the recorded conversations and that he should not have been charged with possession of the cocaine found in a car owned by another person and concealed in a toaster box in the backseat of the car. The State's evidence showed that the conspiracy was ongoing after appellant's arrest, and the recorded phone calls were relevant to show his identity as Manolo-Potrillo, as well as his intent to possess the cocaine found in the backseat of the car he was driving at the time of his arrest. *Cromwell*, supra, 218 Ga. App. at 483 (2).

3. In his remaining enumeration of error, appellant contends that without the wiretaps which are the subject of Division 2 of this opinion, the State presented insufficient evidence that he was the person identified as Manolo/Potrillo in other wiretap recordings. According to appellant, the remaining wiretap evidence should have therefore been excluded, and his conviction must be reversed. Based upon our holding in Division 2 of this opinion, this enumeration of error has been rendered moot as it is dependent upon a finding that the post-arrest recorded conversations should have been excluded.

*Judgment affirmed. Doyle, P. J., and McFadden, J., concur.*